**In re Robert E. FOX, Debtor.**

**No. 03–35768 (LMW).**

United States Bankruptcy Court, D. Connecticut.

Oct. 26, 2006.

small amount of the judgment lien that re- mains unavoided.

Irve J. Goldman, Esq., Jessica Grossarth, Esq., Pullman & Comley, LLC, Bridgeport, CT, for Debtor.

Ignazio J. Lazo, Esq., Cadden & Fuller, LLP, Irvine, CA, for National Wood Products, Inc.

Joseph L. Rini, Esq., New Haven, CT, for National Wood Products, Inc.

### MEMORANDUM AND ORDER GRANTING (IN PART) DEBTOR'S MOTION TO AVOID JUDICIAL LIEN

LORRAINE MURPHY WEIL, Bankruptcy Judge.

The matters before the court are (a) the above-referenced debtor's (the "Debtor")

Motion To Avoid Judicial Lien under § 522(f) of the Bankruptcy Code (Doc. I.D. No. 7, the "Motion")[1] and (b) National Wood Products, Inc.'s ("NWP") objection thereto (Doc. I.D. No. 35, the "Objection"). This court has jurisdiction over this matter as a core proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and that certain Order dated September 21, 1984 of the District Court (Daly, C.J.).[2]

This memorandum constitutes the findings of fact and conclusions of law required by Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Rules") (made applicable here by Rule 9014 of the Rules).

## I. *PROCEDURAL BACKGROUND*

The Debtor commenced this bankruptcy case by the filing of a petition under chapter 7 of the Bankruptcy Code on November 24, 2003 (the "Petition Date"). The Debtor voluntarily converted his chapter 7 case to a case under chapter 11 of the Bankruptcy Code and an order (Doc. I.D. No. 84) to that effect was entered on February 25, 2005. The Debtor remains in possession and/or control of his assets and business affairs as debtor in possession pursuant to Bankruptcy Code §§ 1107 and 1108.

Contemporaneously with his petition, the Debtor filed his schedules and State-

ment of Financial Affairs (Doc. I.D. No. 1). On Schedule A—Real Property the Debtor listed an interest as "Co–Owner" and owner of "½ share" with respect to certain real property located at 15 Long Point Road, Branford, Connecticut (the "Property") with a stated value of $675,000.00. (*See* Doc. I.D. No. 1 (Schedule A).)[3] On Schedule C—Property Claimed as Exempt, the Debtor claims an exemption (the "Exemption") with respect to his interest in the Property in the amount of $75,000.00 under Section 52–352b(t) of the Connecticut General Statutes. (*See* Doc. I.D. No. 1 (Schedule C).)[4] On Schedule D—Creditors Holding Secured Claims, the Debtor lists the following encumbrances in respect of the Property: (a) a first lien held by Washington Mutual Bank, FA ("Washington Mutual") in the amount of $1,436,261.00; (b) a second lien (collectively with the first lien, the "Mortgages") held by Webster Bank in the amount of $182,000.00; and (c) a judgment lien (the "NWP Lien") held by NWP in the amount of $151,467.00. (*See* Doc. I.D. No. 1 (Schedule D).) Mrs. Fox is jointly liable with the Debtor on the Mortgages; the NWP Lien is solely the Debtor's obligation. (*See id.*)

The Motion was filed on December 11, 2003 and seeks to avoid the NWP Lien pursuant to 11 U.S.C. § 522(f). (*See* Doc. I.D. No. 7.) The Objection was filed on

---

**1.** References herein to the docket of this chapter 7 case are in the following form: "Doc. I.D. No. ——."

**2.** That order referred to the "Bankruptcy Judges for this District" *inter alia* "all proceedings ... arising under ... Title 11, U.S.C...." References herein to title 11 of the United States Code or to the Bankruptcy Code are references to the same as they appeared prior to the effective date of their amendment by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

**3.** The Debtor values the entire Property at $1,350,000.00. (*See id.*) The Property is the Debtor's residence which he co-owns with his wife, Loretta Fox. Mrs. Fox is a debtor in a separate chapter 11 case before this court, *see In re Loretta Erma Fox*, Chapter 11 Case No. 04–33468.

**4.** Section 52–352b(t) is Connecticut's "homestead" provision. It is conceded that the Exemption is valid thereunder.

February 9, 2004. An evidentiary hearing (the "Hearing") [5] was held on the Motion and the Objection on January 24, 2006. At the Hearing, Mr. Robert Opotzner (an appraiser) [6] and Matthew Beatman, Esq. (counsel for Loretta Fox) testified for the Debtor, and John Tolbert (an appraiser), [7] Garry Brooke (an appraiser) [8] and Joseph Rini, Esq. (local counsel for NWP) testified for NWP. Both the Debtor and NWP placed documentary evidence into the Hearing record. [9] During the Hearing, certain evidentiary objections and/or motions were taken under advisement and are disposed of below. At the conclusion of the Hearing, the court took the matter under advisement subject to post-Hearing briefing. Post–Hearing briefing now is complete and the matter is ripe for decision.

## II. FACTS [10]

The Property is located in the Stony Creek section of the Town of Branford, Connecticut. The Stony Creek section is "semi-exclusive"; it has its own post office and there is a private beach and an association fee. (See Transcript at 51, 88 (testimony of Mr. Tolbert).) The Property is a direct waterfront property abutting Long Island Sound. (See Transcript at 52 (testimony of Mr. Tolbert).) The Property consists of .64 acres. (See NWP Exh. C at 2.) Located on the Property are (a) a nine room, four bedroom, 2.5 bath, 3,688 square foot, 83–year old residence and (b) a separate 400+ square foot guest house. (See id. at 2–3 (NWP Appraisal).) [11] The Prop-

---

5. A transcript (the "Transcript") of the Hearing appears in the docket of this case as Doc. I.D. No. 283.

6. Mr. Opotzner is a real estate appraiser with 21 years experience in residential appraisals. He has resided in Branford for about 25 years and is familiar with the Branford residential real estate market having done between 100 and 200 appraisals there during his career. He also has done about a "couple hundred" appraisals of Connecticut shore front properties. He has been certified as an appraiser under Connecticut law since the late 1980's. (Transcript at 6–8 (testimony of Mr. Opotzner).) Mr. Opotzner was qualified as an expert at the Hearing. (Id. at 9.) A copy of his appraisal report (the "Debtor Appraisal") is in the record as Debtor Exh. 1 (as hereafter defined).

7. At the time of the Hearing, Mr. Tolbert had been a real estate appraiser for about 4½ years. He had recently become certified as an appraiser under Connecticut law. He was pursuing his SRA designation (i.e., designation as a senior residential appraiser). He was living in Branford and had done so for about six years. He had done about 300 to 400 appraisals in total, about 20 of those in Branford. (Transcript at 48–50 (testimony of Mr. Tolbert).) He is "intimate" with the Stony Creek area (where the Property is located) because he runs there five or six times a week. (Transcript at 62 (testimony of Mr.

Tolbert).) Mr. Tolbert was qualified as an expert at the Hearing. (Id. at 50.)

8. At the time Mr. Tolbert performed his appraisal of the Property he was not yet certified and his work had to be reviewed by a supervising appraiser. Mr. Brooke was that reviewing appraiser and signed the relevant appraisal report in that capacity. Mr. Brooke has been an appraiser for about 20 years. He has been certified since the early 1990's and also is a Certified Review Appraiser. He went out to the Property and also went out to the Flying Point Road properties. (Transcript at 111–116 (testimony of Mr. Brooke).) Mr. Brooke was qualified as an expert at the Hearing. (Id. at 113.) A copy of the Tolbert/Brooke appraisal report (the "NWP Appraisal") is in the record as NWP Exh. C (as hereafter defined).

9. References herein to such documentary evidence appear in the following form: "Debtor Exh. ——" or "NWP Exh. ——" (as the case may be).

10. The facts found below and elsewhere in this memorandum have been taken from the record of the Hearing and of this entire bankruptcy case.

11. The Debtor Appraisal describes the residence as having ten rooms, three bedrooms, "2F2H" baths and 3,462 square feet. (See

erty also has a granite boat ramp at which a boat can be docked and launched into the Sound. (*See* Transcript at 72–73 (testimony of Mr. Tolbert).) At the Hearing, the Debtor's appraiser (Mr. Opotzner) testified that the Property was worth $1,350,000.00 as of the Petition Date (*See* Transcript at 10) while NWP's appraisers (Messers. Tolbert and Brooke) testified that the Property was worth $2,200,000.00 as of the Petition Date (*See* Transcript at 78, 115).

As noted above, (a) the Property is co-owned by the Debtor and his wife and (b) the Mortgages are their joint obligation but (c) the NWP Lien is solely the Debtor's obligation. The aggregate amount of the Mortgages as of the Petition Date was $1,602,655.45. (*See* Transcript at 21 (Stipulation).) The amount of the NWP Lien as of the Petition Date was $151,467.19. (*See id.*)

Some time in 2003, Washington Mutual commenced a foreclosure action (the "Foreclosure Action") on its mortgage with respect to the Property.[12] NWP was a defendant in the Foreclosure Action. (*See* Transcript at 30–31 (testimony of Attorney Rini).) Washington Mutual filed therein a motion for judgment of strict foreclosure. (*See* Debtor Exh. 5 (Washington Mutual's Motion for Judgment of Strict Foreclosure).) Annexed to that motion was a copy of an appraisal report (the "Bank Appraisal") in respect of the Property prepared by Esposito & Associates for Washington Mutual's counsel stating a value for the Property of $1,600,000.00 as of March 8, 2004. (*See id.* (annexed Bank Appraisal).) NWP moved in the Foreclosure Ac-

tion for foreclosure by sale but NWP could not obtain the necessary supporting return of appraiser in a timely manner. (*See* Transcript at 31–32 (testimony of Attorney Rini).) Nevertheless, on or about April 19, 2004 the foreclosure court entered a Judgment of Foreclosure by Sale (the "Foreclosure Judgment," a copy of which is in the record as Debtor Exh. 6) which found the Property value to be $1,600,000.00 and which scheduled a sale of the Property for July 24, 2004. (*See id.*)[13] No foreclosure sale has been confirmed in the Foreclosure Action.

## III. *ANALYSIS*

### A. *Standards*

Section 522(f) provides in relevant part as follows:

(1) [T]he debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is—

(A) a judicial lien . . . .

. . .

(2) (A) For the purposes of this subsection, a lien shall be considered to impair an exemption to the extent that the sum of—

(i) the lien;

(ii) all other liens on the property; and

---

Debtor Exh. 1.) The Bank Appraisal (as hereafter defined) describes the residence as having nine rooms, three bedrooms, 2.5 baths and 2,732 square feet. (*See* Debtor Exh. 5.) The parties have not attached any significance to these differences and neither will the court.

**12.** Washington Mutual was granted relief from stay in this case to continue the Foreclosure Action pursuant to an order dated February 4, 2004. (*See* Doc. I.D. No. 30.)

**13.** Copies of the related Affidavit of Appraiser and Return of Appraiser are in the record as Debtor Exh. 7 and Exh. 8 (respectively).

(ii) the amount of the exemption that the debtor could claim if there were no liens on the property;

exceeds the value that the debtor's interest in the property would have in the absence of any liens.

11 U.S.C.A. § 522(f) (West 2005). *See also* 11 U.S.C.A. § 522(a)(2) (" '[V]alue' means fair market value as of the date of the filing of the petition...").

▮ Subject to certain exceptions not relevant here, all determinations relevant to Section 522(f)(1) and 522(f)(2) are made as of the petition date. *In re Salanoa,* 263 B.R. 120, 123 (Bankr.S.D.Cal.2001) ("The Court holds the petition date is the operative date to make *all* § 522(f) determinations." (emphasis added)). That includes the date for valuing the liens relevant to a Section 522(f)(2)(A) calculation. *Salanoa,* 263 B.R. at 123. The Debtor bears the burden to prove by a preponderance of the evidence each element necessary for a Section 522(f)(1) lien avoidance. *See, e.g., Soost v. NAH, Inc. (In re Soost),* 262 B.R. 68, 74 (8th Cir. BAP 2001) ("As the movant, the debtor bears the burden of proving by a preponderance of the evidence all the elements required to establish his entitlement to lien avoidance under section 522(f) of the Bankruptcy Code."); *Premier Capital, Inc. v. DeCarolis (In re DeCarolis),* 259 B.R. 467, 471 (1st Cir. BAP 2001) ("Debtor has the burden of proof on all avoidance issues."). If the Section 522(f)(2) calculation yields a negative number as to a target lien, the lien is avoided but only to that extent. *See East Cambridge Savs. Bank v. Silveira (In re Silveira),* 141 F.3d 34 (1st Cir.1998); *Soost,* 262 B.R. at 74; *Tedeschi v. Falvo (In re Falvo),* 227 B.R. 662, 666–67 (6th Cir. BAP 1998). *Accord Corson v. Fidelity and Guaranty Ins. Co. (In re Corson),* 206 B.R. 17, 22 (Bankr.D.Conn.1997) (Dabrowski, J.).

**B.** *Application of Section 522(f)(2)(A) to Jointly Owned Property*

There is a conflict of authority as to whether Section 522(f)(2)(A)'s direction that the sum of *"all* other liens on the property,"* 11 U.S.C.A. § 522(f)(2)(A) (emphasis added), be deducted from the "value ... [which] the debtor's *interest* in the property would have in the absence of any liens," *id.* (emphasis added), requires that the full amount of a joint mortgage be deducted from the value of the debtor's partial interest in the property in determining whether a judgment lien is "impaired" within the meaning of Section 522(f)(1)(A). *See In re White,* 337 B.R. 686, 689 (Bankr.N.D.Cal.2005) (surveying conflicting cases). Compare White, supra (full amount of joint mortgage must be deducted from the value of the debtor's partial interest) *with Miller v. Sul (In re Miller),* 299 F.3d 183 (3d Cir.2002) (only ratable portion of joint mortgage properly is deducted from the value of the debtor's partial interest). Not surprisingly, the Debtor urges this court to adopt the White approach because application of that approach would render the Exemption "impaired" within the purview of Section 522(f)(1)(A) even if the Property is worth what NWP says the Property is worth. Needless to say, NWP urges the opposite proposition.

▮ The court agrees with those courts which have held that Section 522(f)(2)(A) does not compel the *White* approach. *See, e.g., Miller, supra; Lehman v. VisionSpan, Inc. (In re Lehman),* 205 F.3d 1255 (11th Cir.2000); *Nelson v. Scala,* 192 F.3d 32, 35 n. 2 (1st Cir.1999). As the *Miller* court observed:

It is illogical to net the total outstanding secured debt balance attributable to both a debtor and his joint tenant against the debtor's one-half interest in

the property alone because Congress could not have intended that a debtor benefit under section 522(f)(2)(A) by the use of what realistically should be regarded as someone else's debt even if the debtor may be liable personally to the creditor for the entire debt.

*Miller*, 299 F.3d at 186.

■ Among those courts rejecting the *White* approach, there is a difference in the manner of calculating "impairment" (but not in the mathematical result). *Compare Miller, supra* (prorate the joint liens between the co-owners' interests) *with In re Ware*, 274 B.R. 206 (Bankr. D.S.C.2001) (bankruptcy court had to start with the total value of the property, then subtract full amount of joint liens and then divide the difference (*i.e.*, the joint equity) ratably between the co-owners' interests). *See also Lehman*, 205 F.3d at 1257.[14] This court adopts the *Miller* proration approach as more consistent with the language of Section 522(f)(2)(A). *Accord Dolan v. D.A.N. Joint Venture (In re Dolan)*, 230 B.R. 642, 647 n. 4 (Bankr.D.Conn.1999) (Krechevsky, J.) (using *Miller* proration approach), *abrogated on other grounds by Trahan v. Day Kimball Hospital (In re Trahan)*, 337 B.R. 448, 450 (Bankr. D.Conn.2006) (Krechevsky, J.).

## C. *Other Preliminary Issues*

### 1. *Effect of Foreclosure Judgment*

■ The Debtor argues that, because NWP was a party defendant to the Foreclosure Action, the finding of Property value contained in the Foreclosure Judgment (*i.e.*, $1,600,000.00) is binding on NWP under the doctrine of collateral es-

toppel. The court does not agree. As an initial matter, the valuation in the Foreclosure Judgment was either as of March 8, 2004 (*See* Debtor Exh. 7) or as of the date of that judgment (i.e., April 19, 2004). As discussed above, the issue here is the value of the Property (actually the value of the Debtor's interest in the Property) as of the Petition Date (*i.e.,* November 24, 2003). Therefore, the respective issues in the Foreclosure Action and these proceedings are not identical. Under applicable Connecticut law, for a judgment in a prior action to preclude litigation of an issue in a later action, the issues in both actions must be identical. *See Crochiere v. Board of Educ. of Town of Enfield,* 227 Conn. 333, 345, 630 A.2d 1027 (1993) ("Before collateral estoppel applies there must be an identity of issues between the prior and subsequent proceedings. To invoke collateral estoppel the issues sought to be litigated in the new proceeding must be identical to those considered in the prior proceeding.").

■ Moreover, even if the issues are deemed to be identical (which they are not), the court is mindful of the admonition of the Connecticut Supreme Court that pre-sale determinations of property value rendered during the foreclosure-by-sale process "are primarily intended to give the court a valuation by which to judge the fairness of the highest bid received ... [and are] *not conclusive in determining valuation for the purpose of resolving collateral issues." Bryson v. Newtown Real Estate and Dev. Corp.,* 153 Conn. 267, 274, 216 A.2d 176 (1965) (emphasis added; alteration added). Accordingly, for all of the

---

14. In effect, the [bankruptcy] court was simply substituting ... the total value of the home ($225,000) in place of Lehman's interest in the home in the absence of any liens ($112,500) [and dividing the resulting equity in half]. The same outcome would also be produced by substituting the value of the NationsBank mortgage attributable to Lehman's share of the property ($82,500), in place of the value of the mortgage on the whole property ($165,000).

above-stated reasons, the court concludes that NWP is not precluded by the doctrine of collateral estoppel from litigating here the issue of Property valuation as of the Petition Date.

The Debtor argues that, even if the Foreclosure Judgment is not collateral estoppel here, it, the Bank Appraisal and the related Return of Appraiser still are evidence of Property value as of the Petition Date (presumably by assuming stability of market values back to the Petition Date). However, without the supporting testimony here of the appraiser who rendered the Bank Appraisal (and made the Return of Appraiser), or any testimony respecting market stability, the court gives the Bank Appraisal (and the corresponding valuation finding of the Foreclosure Judgment) very little weight as evidence of Property value as of the Petition Date.

### 2. *Alleged $1.6 million NWP Appraisal*

Attorney Beatman (Loretta Fox's counsel) testified at the Hearing that Attorney Rini (local counsel for NWP) admitted in discussions between them some time in 2005 that NWP then had in its possession a written appraisal of the Property (allegedly prepared for NWP or its counsel) stating a valuation of $1,600,000.00. (*See* Transcript at 40–41 (testimony of Attorney Beatman).) The Debtor buttresses its position by pointing to the fact that, when asked to "produce all appraisals of the . . . [Property]" pursuant to Rule 7034 of the Rules,[15] NWP did not state that the Bank Appraisal was the only appraisal report it had but, rather, objected (in part) to that request based upon the "attorney-client and work product privileges." (Debtor

Exh. 9 at 8 (Response of National Wood Products, Inc. to Movant's First Set of Interrogatories and First Request for Production of Documents signed (as to answers) by NWP on May 11, 2005 and (as to objections) by Attorney Rini on June 3, 2005).) However, the court credits Attorney Rini's testimony that the only $1,600,000.00 appraisal for the Property he was aware of was the Bank Appraisal and it was to that appraisal he was referring in his discussions with Attorney Beatman.[16] That appraisal is before the court and, as discussed above, the court gives it very little weight.

### D. *Valuation*

■ The court declines to accept either party's appraisal *in toto.* However, for the purposes of a starting point, the court is more persuaded by the NWP Appraisal than by the Debtor Appraisal for reasons including the following. Both appraisals rely upon the "comparable sales" approach to valuation. (*See* Transcript at 11 (testimony of Mr. Opotzner); NWP Exh. C at 3 ("[Cost Approach] is not a relevant approach to valuation in this case. . . .").) The NWP Appraisal uses all waterfront (Long Island Sound front) properties as comparable sales; the Debtor Appraisal uses only one such property. (*See* NWP Exh. C at 3 (all "waterfront" properties or "waterfront +" properties (with appropriate downward adjustment))); Transcript at 53:25—54:1 and 63:20–22 ("[The] Harbor Street [property used in the Debtor Appraisal] . . . faces the Branford River [rather than Long Island Sound]. . . . The description used for the . . . [Property] is waterfront, and [the] Juniper Point [property used in the Debtor Appraisal] would

---

**15.** Rule 7034 is applicable to these proceedings pursuant to Rule 9014 of the Rules.

**16.** In light of the court's above-stated finding, the court need not consider the "settlement discussions" privilege discussed by the parties in their respective briefs.

be water view.") (testimony of Mr. Tolbert). The court is persuaded by the testimony of Mr. Tolbert that it is not reasonable for an appraiser to compare a property which abuts Long Island Sound to properties which are on the Branford River or which merely have a "water view." (*See* Transcript at 52–54 (testimony of Mr. Tolbert); *see also* Transcript at 125:14–23 ("[The Property] … is very unique. It's sitting on a cove. It has [a] beautiful view of the cove and also Long Island Sound to [the] Thimble Islands…. You cannot compare properties that are away from the shoreline or do not have comp[arable] views ….") (testimony of Mr. Brooke).)

However, the court is persuaded that the NWP Appraisal must be adjusted downward because the sales price for the "16 Flying Point Road" property which the NWP Appraisal used as "Comparable No. 2" was overstated therein. Mr. Tolbert testified that he relied on the hearsay statement of a fellow appraiser that the relevant sales price for the 16 Flying Point Road property was $3,000,000.00 (as opposed to the $2,340,000.00 sales price recited in the relevant deed (Debtor Exh. 10) and the "field card" maintained by the Branford town assessor (Debtor Exh. 11)). (*See* Transcript at 98 (testimony of Mr. Tolbert).) Mr. Brooke assumed that Mr. Tolbert had verified that hearsay statement with the deed, but Mr. Tolbert had not. (*See* Transcript at 133–34.) The court finds the only persuasive evidence of the sales price for 16 Flying Point Road to

be Debtor Exhs. 10 and 11 which state a sales price of $2,340,000.00.[17]

Further adjusting the "Adjusted Sales Price of Comparable" as recited in the NWP for 16 Flying Point Road to reflect the lower "Sales Price" for that property, the relevant "Adjusted Sales Price of Comparable" for that property becomes $1,959,500.00. Weighing the "Adjusted Sales Price Comparable" for the three "comparable" properties equally as does the NWP Appraisal (*See* NWP Exh. C at 3 ("As a result of the range, quality, and consistency of the sales data, all comparable sales were weighted equally as adjusted.")), the appropriate value for the Property is $1,988,933.00.[18]

There are two putative further adjustments which the court declines to make. Mr. Tolbert attacked the Debtor Appraisal's use of the "39 Flying Point Road" property as a comparable sale and attempted to renounce the NWP Appraisal's use of the same property for the same purpose because of alleged information he obtained the day before the Hearing that the relevant sale may not have been "arms length." (*See* Transcript at 82–84 (testimony of Mr. Tolbert).) However, Mr. Tolbert also testified that he did not really know that the sale was not arms length, that the property had been listed on the MLS (Multiple Listing Service) for $1,600,000.00 and that such listing "more than likely" indicated an arms length sale. (Transcript at 83–85.) Based on the foregoing, the court sees no reason to redact

---

**17.** The court does not believe that Mr. Tolbert lied when he said that he had verified the

**18.**

$$\frac{\$2,278,000.00}{3} + \frac{\$1,959,500.00}{3} + \frac{\$1,729,300.00}{3} = \$1,988,933.00$$

Because of the importance of each marginal dollar in this case, the court declines to "round" that value figure either up or down.

higher sales price with the relevant deed but, rather, that he misremembered.

that property from the appraisals or to adjust the stated purchase price(s).[19]

The Debtor argues that the 166 Middle Beach Road property (which is "Comparable No. 1" in the NWP Appraisal) either is entirely inappropriate because it is located in Madison which is two towns removed from Branford and a more desirable area than Branford, or its value in the NWP Appraisal needs to be adjusted downward. Mr. Tolbert testified that although Madison is a more desirable area than Branford generally, the Stony Creek area of Branford is comparable to the Madison shore. (*See* Transcript at 88 (testimony of Mr. Tolbert); *see also* Transcript at 125:14–21 ("[W]e're dealing with a property that is very unique. . . . In order to match apples with apples you have to extend the market search beyond that. In fact, in this case, definitely beyond the town and go along the coastline in order to find more comparable sales.") (testimony of Mr. Brooke).) The court credits that testimony and is satisfied that the NWP Appraisal's use of the Middle Beach Road property was appropriate and that appraisal's adjustments in respect of that property also were appropriate.

### E. *Section 522(f)(2) Calculation*

 Based upon the above, the Section 522(f) calculation for the NWP Lien is as follows:

| | |
|---|---|
| Value of Property = | $1,988,933.00 |
| Value of Debtor's Interest in the Property ("Debtor Value") $\frac{\$1,988,933.00}{2}$ = | $994,466.50 |
| Total Mortgages = | $1,602,655.45 |
| Portion of Mortgages Apportioned to Debtor's Interest in the Property ("Debtor Mortgages") = $\frac{\$1,602,655.45}{2}$ = | $801,327.73 |
| Debtor Value—Debtor Mortgage—NWP Lien–Exemption = $994,466.50—$801,327.73–$151,467.19–$75,000.00 = | -$ 33,328.42 |

Accordingly, because the result of the Section 522(f)(2) calculation is negative, the NWP is avoidable to that extent (*i.e.*, $33,328.42).

of $33,328.42 and is unaffected to the extent of $118,138.77.

It is **SO ORDERED.**

### IV. *CONCLUSION*

For the reasons discussed above, the NWP Lien shall be avoided to the extent

**19.** The court's resolution of the above issue moots the pending related evidentiary dispute.